UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA

       -v-

                                07 Cr 484 (NG)
JON ITZKOWITZ,

                                ECF CASE

               Defendant.
--------------------------------------------------X


# SENTENCING MEMORANDUM ON BEHALF OF THE DEFENDANT JON ITZKOWITZ

Alan M. Nelson, Esq. (AMN 3891)
3000 Marcus Avenue, Suite 1E5
Lake Success, New York 11042
(516)328-6200

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
UNITED STATES OF AMERICA


-v-

**07 Cr 484 (NG)**

JON ITZKOWITZ,

**Defendant.**
---------------------------------------------------X

## DEFENDANT JON ITZKOWITZ' SENTENCING MEMORANDUM

### I. PRELIMINARY STATEMENT

Jon Itzkowitz is to appear before your Honor to be sentenced, following his plea of guilty

to a one Count Information charging him with violations of 21 U.S.C. 841(b)(1)(B) and 846,

conspiracy to distribute 500 grams or more of cocaine "on or about March 16, 2007". (See Exhibit

"A", Felony Information).

### II. BACKGROUND

The circumstances to be considered by the Court in sentencing Jon Itzkowitz are both unusual

and unique.  To facilitate the proper evaluation of the sentencing factors articulated in 18 U.S.C.

3553 United States v. Booker, 125 S.Ct. 738 (2005) it is important for the Court to understand the

procedural history of the case.

By way of background, Jon Itzkowitz was arrested on March 17, 2007.  The arrest followed

his participation in the sale of 500 grams of cocaine to a confidential information pursuant to a

controlled purchase earlier that day.

Following his arrest Itzkowitz immediately agreed to cooperate with the government and pro-

actively assist in the investigation of Gary and Jeffrey Jacques and other individuals from whom he acquired cocaine.  Towards that end he was released that day on a $100,000 Unsecured Bond.  Due his acknowledged dependence upon cocaine and marijuana Itzkowitz' Conditions of Release included out-patient drug treatment and travel restrictions limited to the Eastern and Southern Districts of New York.

On August 2, 2007 Jon Itzkowitz plead guilty before the Hon Joan Azrack to the sole Count of an Information charging:

> "On or about March 16, 2007... the defendant Jon Itzkowitz...
> did knowingly and intentionally conspire to possess with intent
> to distribute a controlled substance which offense involved 500 or
> grams or more or a substance containing cocaine..."

The plea was pursuant to a written cooperation agreement which amongst other things provided:

> "Should it be judged by the Office that the defendant has failed
> to cooperate fully, has intentionally given false, misleading or
> incomplete information or testimony, has committed or attempted
> to commit any further crimes... the defendant will not be released
> from his plea of guilty but this Office will be released from its
> obligations under this agreement..." (Exhibit "B" Plea Agreement
> Paragraph 8).

Between March 2007 and May 2010, a period of three years Itzkowitz participated in on-going out-patient drug treatment first through Pre-trial Services and then at his own expense at the Huntington Drug and Alcohol Treatment Center. (See Exhibit "C", Drug Treatment Records). Throughout this period of time Itzkowitz was drug tested regularly for marijuana and cocaine and as evinced by consistent negative results did not revert to the use of these substances.

From March 2007 until February 2009 Itzkowitz maintained gainful employment

chronologically at: (1) Michael's Art Supply; (2) Stop and Shop's delicatessen department and (3) IGA's delicatessen department.

Most importantly, during this same period of time Itzkowitz provided significant proactive cooperation which greatly assisted in the Indictment, arrest and extradition of Gary Jacques in November 2007 and the arrest and Indictment of Gary Jacques the next year. (See United States v. Gary Jacques, et al (Cr. 08-577) (S-2)(NG).  As the court is aware from the trial of that matter although the government had acquired significant information concerning the importation end of the Jacques' narcotics organization prior to Itzkowitz arrest, his assistance was instrumental in revealing both the distribution aspects of the organization and Jeffrey Jacques role therein.  Indeed absent the defendant's assistance it is possible that Jeffrey Jacques would have been Indicted and sufficient information to extradite Gary Jacques from Haiti might not have been acquired.

Unfortunately during this same period of time Itzkowitz developed a dependence to the prescribed pain medications Percocet and Oxicodene.  He was prescribed these medications by his treating physician Dr. Okeke due to chronic pain caused by the knee disease known as Osgood-Schlatter Disease.  (See  Exhibit "D" Prescription Records).   The disease is characterized by pain and swelling at the tibial tubercle, the point of insertion of the patellar tendon intersection of the patellar.  The disease  causes deterioration of the joint, weakness and pain in adolescents and normally resolves as the individual matures.  However obesity resulting in increased stress and lack of an exercise program can prolong and aggravate the disease.

Itzkowitz appears to have developed a dependence to these pain medications.  He hid this dependence from his drug counselors and the government.  Unfortunately Itzkowitz supplemented his prescribed medications by acquiring these drugs illegally.

3

On May 25, 2010 while preparing for the trial of Gary and Jeffrey Jacques Itzkowitz was confronted with evidence that he had met with an individual named "Archie" with whom it was alleged he had negotiated purchases of cocaine and pain medication. Itzkowitz acknowledged these meetings but was at least initially less than candid concerning them. At a subsequent meeting Itzkowitz admitted his dependence and abuse of pain medication and acknowledged discussing the acquisition of pain medication and cocaine from"Archie". While Itzkowitz was forthright in his acknowledgment that he had acquired non-prescribed pain medication from Archie, his failure to do so voluntarily coupled with his initial lack of candor concerning this conduct ultimately led the government to determine he would not be a valuable trial witness and determined he had breached Paragraph 8 of the Plea Agreement.

Following the trial and conviction of both Gary and Jeffrey Jacques (which trial was conducted before the Court in June 2010) the government moved on August 3, 2010 for the remand of Itzkowitz pending sentencing premised upon that conduct, which application the Court granted.

Jon Itzkowitz respectfully submits this memorandum in support of his request for a sentence below the advisory guideline range calculated in the PSR. We ask the Court exercise its sentencing discretion and impose a sentence "sufficient but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. 3553(a) which, in our view, supports a non-Guidelines sentence.

The defendant submits that there are important aspects of Jon Itzkowitz's personal history, the nature and circumstance of his participation in the offense and most significantly the efforts he has make post arrest to: (1) assist the government in the investigation and prosecution of other individuals engaged in the unlawful sale of narcotics; and (2) participate in counseling, which

4

warrant consideration in determining whether to impose a sentence below the guideline range.

By this memorandum and for the reasons more fully set forth herein Jon Itzkowitz respectfully requests that the court impose a sentence based upon all the factors set forth in 18 U.S.C. 3553(a), Gall v. United States, 128 S.Ct. 586 (2007), Kimbrough v. United States, 128 S.Ct. 558 (2007); United States v. Booker, 125 S.Ct. 738 (2005) and United States v. Cavera, 550 F.3d 180 (2nd Cir. 2008).   At the outset we respectfully submit that in applying those factors a non-guideline below the advisory guideline range is warranted.

### III.  GUIDELINE OBJECTIONS

Upon review of the Pre-Sentence Report (PSR) prepared by the Probation Department the defendant disagrees with the Advisory Guideline Computation contained in the Presentence Report in three significant respects.

*1. Base Offense Level*

Jon Itzkowitz submits that his Base Offense Level should be 26 rather than 34.  Itzkowitz plead guilty to a single Count Information alleging that on or about March 16, 2007 he agreed with others to distribute 500 grams or more of cocaine.  (See Exhibit "A" Felony Information).   PSR Paragraph 4 accurately describes that finite transaction as involving a 500 gram (½ kilogram) sale of cocaine.  Although subsequent to his arrest and in the context of significant pro-active cooperation Itzkowitz acknowledged participation in a much more far reaching narcotics conspiracy, his guilty plea was limited to the single finite transaction conducted on or about March 16, 2007.

U.S.S.G. 1B1.3 (Relevant Conduct) holds a defendant responsible: (A) for all acts and omissions committed by him; and (B) in the case of jointly undertaken activity all reasonably foreseeable acts and omissions of others in furtherance or the jointly undertaken criminal activity,

a defendant's liability is limited by the language of 1B1.3(a)(1) to "*the offense of conviction*."

Here, the specific language of the Information to which Itzkowitz entered his guilty plea, the "*offense of conviction*", limits his exposure to the conduct charged therein. The Information charges:

> "On or about March 16, 2007... the defendant Jon Itzkowitz...
> did knowingly and intentionally conspire to possess with intent
> to distribute a controlled substance which offense involved 500 or
> grams or more or a substance containing cocaine..."

Pursuant to U.S.S.G. 1B1.3(a)(1) his relevant conduct is limited to conduct which occurred during the commission of the offense of conviction. Accordingly, Itzkowitz' base offense level must be limited to the conduct set forth in the Information which is "the offense of conviction".

Ordinarily, as a consequence of the offense being one which would be grouped under U.S.S.G. 3D1.2 it would be governed by 1B1.3(a)(2). That section provides that relevant conduct includes all conduct that is part of the "same course of conduct or common scheme or plan". However, here the unique circumstances under which the government became aware of this uncharged relevant conduct must be considered. Itzkowitz agreed to cooperate immediately upon his arrest. He thereafter commenced pro-active cooperation during the course of which he was debriefed during proffers. In the course of these debriefings he informed the government of his uncharged conduct which conduct is now the basis of enhancement as "relevant conduct" under 1B1.3(a)(2). Significantly, Itzkowitz entered his guilty plea to the above described Information which limits the time frame of the offense of conviction subsequent to those proffers.

It is therefore submitted that pursuant to 1B1.2(a)(1) his base offense level should not include the uncharged conduct the government became aware of solely on the basis of Itzkowitz' admissions

during his debriefings.  Accordingly pursuant to U.S.S.G. 2D1.1(a)(7 ) his base offense it is

submitted should be Level 26 not 34.

Alternatively, as discussed below the significant increase in his offense level based upon this

uncharged conduct which information was acquired due to the defendant's cooperation for which

the government now refuses to make a motion pursuant to 5K1.1 and 18 U.S.C. 3553(e) on his

behalf should be considered by the Court in determining whether to vary from the Advisory

Guideline Range (18 U.S.C. 3353(a) and  United States v. Booker, 125 S.Ct. 738 (2005).

2. *Acceptance or Responsibility*

Second, Itzkowitz submits that he should receive a 2 level reduction for Acceptance of

Responsibility pursuant to U.S.S.G. 3E1.1.[1]

As described above following Itzkowitz' arrest on March 17, 2007 he immediately agreed

to cooperate with the government and pro-actively assist in the investigation of Gary and Jeffrey

Jacques and other individuals.  Towards that end he was released that day on a $100,000 Unsecured

Bond.  The Conditions of Release included out-patient drug treatment and travel restrictions limited

to the Eastern and Southern Districts of New York.

Between March 2007 and May 2010, a period of three years Itzkowitz participated in on-

---

[1] Itzkowitz having been fully debriefed by the government immediately following his arrest "assisted authorities in the in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty thereby permitting the government to avoid preparing for trial and allocating their resources to the larger investigation" from any objective view clearly qualifies for an additional 1 level decrease pursuant to U.S.S.G. 3E1.1(b).  However, the government's refusal to make such motion due to their perception he breached the plea agreement by subsequent personal drug use precludes such additional reduction.  As discussed below, it is submitted his uncompensated cooperation should form the basis of either a departure for extraordinary acceptance of responsibility or a variance from the Advisory Guideline range pursuant to 18 U.S.C. 3553.

going out-patient drug treatment first through Pre-trial Services and then at his own expense at the

Huntington Drug and Alcohol Treatment Center. (See Exhibit "C", Drug Treatment Records).

Throughout this period of time Itzkowitz was drug tested regularly for marijuana and cocaine and

as evinced by consistent negative results did not revert to the use of these substances.

From March 2007 until February 2009 Itzkowitz maintained gainful employment

chronologically at: (1) Michael's Art Supply; (2) Stop and Shop's delicatessen department and (3)

IGA's delicatessen department.

Most importantly, during this same period of time Itzkowitz provided significant proactive

cooperation which in fact led to the arrest, and prosecution of Gary and Jeffrey Jacques, the targets

of the government's investigation.  Indeed absent the defendant's assistance it is unlikely that the

Jacques would have been Indicted let alone later successfully prosecuted.

Unfortunately during this same period of time Itzkowitz developed a dependence to the

prescribed pain medications Percocet and Oxicodene.  He was prescribed these medications by his

treating physician Dr. Okeke due to chronic pain caused by the knee disease known as Osgood-

Schlatter Disease.  (See  Exhibit "D" Prescription Records).   The disease is characterized by pain

and swelling at the tibial tubercle, the point of insertion of the patellar tendon intersection of the

patellar.  The disease  causes deterioration of the joint, weakness and pain in adolescents and

normally resolves as the individual matures.  However obesity resulting in increased stress and lack

of an exercise program can prolong and aggravate the disease.

Itzkowitz appears to have developed a dependence to these pain medications.  He hid this

dependence from his drug counselors and the government.  Unfortunately Itzkowitz supplemented

his prescribed medications by acquiring these drugs illegally.

Itzkowitz did not return to the distribution of narcotics, rather he illegally acquired prescription pain medication to which he was addicted for personal use. That the defendant utilized non-prescribed pain medication to which he was addicted subsequent to his guilty plea, while a breach of Paragraph 8 of the plea Agreement, is not in any manner inconsistent with his accepting responsibility for his criminal conduct in distributing cocaine.

3. *Extraordinary Acceptance of Responsibility*

Having acknowledged significant criminal conduct of which the government was unaware and thereby exposing himself to a greatly enhanced Guideline level Itzkowitz clearly fully accepted responsibility for his conduct. Indeed such conduct can only be characterized as "exceptional acceptance of responsibility" . The government acquired the benefit of Itzkowitz' cooperation in initially charging and then extraditing Gary Jacques and subsequently Indicting Jeffrey Jacques. Itzkowitz provided the government with significant information concerning the Jacques' distribution of cocaine in Suffolk County and other locations which they would not have acquired absent his assistance. In truthfully providing this information Itzkowitz described prior conduct he engaged in with the Jacques of which the government had no knowledge. In so doing Itzkowitz both assisted the government and greatly enhanced his sentencing exposure.

Although the government has the prerogative to both refuse to move for a sentencing reduction and utilize the information acquired from Itzkowitz to seek an enhanced sentence as a consequence of his abuse of non-prescribed pain medication and lack of candor on the issue, the Court similarly has the authority to consider both the nature and extent of Itzkowitz' cooperation and the underlying cause of his breach in fashioning a sentence sufficient but not greater than necessary to accomplish the sentencing goals of 18 U.S.C. 3553.

9

Pre-<u>Booker</u> numerous courts have recognized the Court's power pursuant to U.S.S.G. 5K2.0 and 5K1.6 to depart where a defendant has demonstrated "exceptional acceptance of responsibility". See <u>United States v. Rogers</u>, 972 F.2d 489 (2nd Cir. 1992); <u>United States v. DeMonte</u>, 25 F.3d 343 (6th Cir. 1994) and <u>United States v. Gee</u>, 226 F.3d 885 (7th Cir. 2000).   Post-<u>Booker</u>, 18 U.S.C. 3553(a) mandates that the Court consider both the nature and circumstances of the defendant's participation in the offense and his background and character in fashioning an appropriate sentence.

It is submitted that the unique circumstances of the events herein, particularly Itzkowitz extensive and long-term pro-active cooperation coupled with reason for his breach, addiction to pain medication warrant a variance from the Advisory Guideline Range.

4. *Safety Valve*

Regardless of whether the government or Court considers the defendant's conduct in failing to fully inform the government of abuse of non-prescribed opiate based medication subsequent to his guilty plea, there is no doubt he fully informed the government of his role in offense.  Having no Criminal history Points, there being no claim of violence, leadership role or possession of a firearm, Itzkowitz clearly satisfies the criteria for qualifying for the benefit of the "Safety Valve" provisions of U.S.S.G. 2D1.1(b)(11) and 5C1.2.  Accordingly the defendant submits that he in fact does qualify for relief of the Safety Valve pursuant to U.S.S.G. section 2D1.1(b)(11) and 5C1.2.  It is submitted the PSR should be amended to so reflect.

5. *Guideline Analysis*

It is submitted that the correct Advisory Guideline offense level is 22, Criminal History

Category I and accordingly his Advisory Sentencing Range is 41-51 months incarceration.[2]

More significantly Jon Itzkowitz respectfully submits this memorandum in support of his request for a sentence below the advisory guideline range calculated in the PSR.  We ask the Court exercise its sentencing discretion and impose a sentence "sufficient but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. 3553(a) which, in our view, supports a non-Guidelines sentence.

## IV.   THE COURT SHOULD IMPOSE A SENTENCE BELOW THE ADVISORY GUIDELINE RANGE CALCULATED IN THE PSR

### A. Post Booker Sentencing

In the wake of United States v. Booker, 125 S.Ct. 738 (2005) the Second Circuit in United States v. Crosby, 397 F.3d 103 (2nd Cir. 2005) and United States v. Cavera, 550 F.3d 180 (2nd Cir. 2008) has instructed district courts with pertinent suggestions as to the appropriate procedure to follow in sentencing.  In a series of subsequent decisions the Supreme Court and the Second Circuit have confirmed that under the advisory Guidelines regime, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007; Nelson v. United States, 129 S. Ct. 890 (2009).

In so doing the Court in Gall stated:

As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.  The

---

[2] Base Offense Level 2D1.1(a)(7) (500 grams cocaine) 26
Safety Valve 5C1.2, 2D1.1(b)(11)              -2
Acceptance of Responsibility 2E1.1            -2
                    Advisory Guideline Calculation    22

11

Guidelines are not the only consideration however.  Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district court should then consider all of the 3553(a) factors to determine whether they support the sentence requested by a party. In so doing he may not presume that Guideline range is reasonable... He must make an individualized assessment based upon the facts presented. If he decides that an out-side the Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance.

<u>Gall</u> at 49-50.

In <u>Nelson v. United States</u> , —U.S.—129 S.Ct. 890, 891-92 (2009)(per curium), the Supreme Court observed "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable... The Guidelines are not only not mandatory on sentencing courts, they are also not to be presumed reasonable".

As noted above, the defendant submits that Itzkowitz's Advisory guidelines sentencing range is 41-51 months.  The advisory range should not be followed because: (1) it is greater than necessary to promote the goals of sentencing and fails to give due consideration to all of the factors set forth in 18 U.S.C. 3553(a); (2) it fails to consider the significant efforts Itzkowitz has taken since his arrest towards post offense rehabilitation; and (3) the significant assistance he has provided to the government in the investigation of the person with whom he acquired cocaine.

**B.  The Purposes of Sentencing In this Case Are Satisfied By A Non-Guideline Sentence.**

18 U.S.C. 3553(a) requires a Court to impose a sentence that is reasonable, one that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection."  Section 3553(a)(2) states that such purposes are:

A.  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
B.  to afford adequate deterrence to the criminal;

C. to protect the public from further crimes of the defendant, and;

D. to provide the defendant with needed educational or vocational training medical care, or other correctional treatment in the most effective manner.

These purposes in this case would all be satisfied by a non-Guidelines sentence.

Generally speaking, "deterrence, incapacitation and rehabilitation are prospective and societal - each looks forward and asks: What amount and kind of punishment will help make society safe. In contrast, retribution imposes punishment based upon a moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community? See United States v. Cole, 662 F. Supp. 632, 637 (N.D. Ohio 2008).

Analyzing Jon Itzkowitz's conduct over the course of the past three years it is submitted that imposition of a non-guideline sentence - would best satisfy that three prong statutory goals of deterrence, incapacitation and rehabilitation.

*i. Itzkowitz's conduct since arrest on March 17, 2007.*

The answer to the first question in this case is that society is safe and need have no fear of Jon Itzkowitz. He has learned his lesson in this case and taken it to heart.

As PSR Paragraphs 38-40 and the accompanying letters from his parents make amply clear Jon Itzkowitz has suffered from severe substance abuse problems since his early teen-age years. As the letters reveal both his parents were addicted to cocaine and alcoholics. They separated when he was 9 contemporaneous with the collapse of his father's commodity brokerage. The family's resulting financial instability coupled with his parents's substance abuse problems led to the family frequently moving and as a consequence the Itzkowitz had difficulty forming close friendships at school or in his neighborhood.

At age 14 he was diagnosed with Osgood-Schlatter disease causing severe knee and leg pain.

13

The disease had two substantial effects upon the defendant.  It prevented him from participating sports activities thereby eliminating the most common avenue to form peer friendships and led to obesity aggravating the disease and further diminishing his self-esteem.  Second, it led to his using and then abusing both prescribed and illegal drugs on a frequent basis at an abnormally young age, particularly in the suburban Suffolk County environment where he resided.

Itzkowitz abuse of drugs was not recognized by his similarly addicted parents.  Nonetheless, despite these difficulties Jon Itzkowitz was an above average student graduating high school timely and enrolled in Bridgeport University which he attended between 1999-2001.  Unfortunately his drug problems caught up with him leading to his expulsion in 2001 for smoking marijuana in a dormitory.

Upon his return to Long Island Itzkowitz resided with his mother, who after prolonged treatment became substance free and acquired employment in the health education department of SUNY Stony Brook.  Between 2001-2003 Itzkowitz worked on a full-time basis as a sales associate first at a local video store then Modell's, Home Depot and the Sport's Authority.   In 2003 while employed at Home Depot he severely fractured his wrist and was prescribed Vicodin for the pain.  While on leave his mother was diagnosed breast cancer and began undergoing an extensive treatment regimen.  As his mother discusses in her letter to the Court the combined factors had a toll on the defendant leading first to his abuse of Vicodin and then its sale to co-workers.  This represented Itzkowitz first entry into the illegal sale of drugs in 2003.

Between 2003 and his arrest Itzkowitz began a downward spiral of the abuse of pain medication, cocaine and marijuana.  This in turn led to his becoming involved in the sale first of the pain medication and later the sale of cocaine through the Jacques.

14

Following his arrest and release on conditions Itzkowitz as required attended out-patient drug treatment at two locations, the Place, in Northport and the Huntington Drug and Alcohol Counseling Center in Huntington, New York. As reflected from the annexed Progress Reports Itzkowitz fully participated and remained abstinent from cocaine and marijuana during the three year period. (See Exhibit "C & F").

While not offered as an excuse, but rather to allow the Court to better understand his conduct in both abusing the medication and failing to divulge it to the government, it is important for the Court to be made aware that shortly after Itzkowitz commenced his cooperation his mother was diagnosed adenoid cancer. While currently in remission the combined effects of his mother's status and weight of the case clearly impacted upon the defendant and led to his making improper choices in coping with the issues. However, it must be stressed he did not return to the sale of any of these drugs.

ii. *Offense Conduct and Post Offense Cooperation*.

Mr Itzkowitz was arrested on March 17, 2007. Upon his arrest the defendant immediately agreed to cooperate with the government and pro-actively assist in the investigation of Gary and Jeffrey Jacques and other individuals. Towards that end he was released that day on a $100,000 Unsecured Bond. The conditions of Release included out-patient drug treatment and travel restrictions limited to the Eastern and Southern Districts of New York.

Between March 2007 and May 2010, a period of three years Itzkowitz participated in on-going out-patient drug treatment first through pre-trial services and then at his own expense at the Huntington Drug and Alcohol Treatment Center. Throughout this period of time Itzkowitz was drug tested regularly for marijuana and cocaine and as evinced by consistent negative results did not revert

15

to the use of these substances.

From March 2007 until February 2009 Itzkowitz maintained gainful employment chronologically at (1) Michael's Art Supply; (2) Stop and Shop delicatessen department and (3) IGA delicatessen department.

Most importantly during this same period of time Itzkowitz provided significant proactive cooperation which in fact led to the arrest, and prosecution of Gary and Jeffrey Jacques, the targets of the government's investigation.   Itzkowitz provided significant proactive cooperation which greatly assisted in the Indictment, arrest and extradition of Gary Jacques in November 2007 and the arrest and Indictment of Gary Jacques the next year. (See United States v. Gary Jacques, et al (Cr. 08-577) (S-2)(NG).  As the court is aware from the trial of that matter although the government had acquired significant information concerning the importation end of the Jacques' narcotics organization prior to Itzkowitz arrest, his assistance was instrumental in revealing both the distribution aspects of the organization and Jeffrey Jacques role therein.  Indeed absent the defendant's assistance it is possible that Jeffrey Jacques would have been Indicted and sufficient information to extradite Gary Jacques from Haiti might not have been acquired.

Unfortunately during this same period of time Itzkowitz developed a dependence to the prescribed pain medications Percocet and Oxicodene.  He was prescribed these medications by his treating physician Dr. Okeke due to chronic pain caused by the knee disease known as Osgood-Schlatter Disease.  The disease is characterized by pain and swelling at the tibial tubercle, the point of insertion of the patellar tendon intersection of the patellar.  The disease causes deterioration of the joint, weakness and pain in adolescents and normally resolves as the individual matures.  However obesity resulting in increased stress and lack of an exercise program can prolong and aggravate the

16

disease.

Itzkowitz appears to have developed a dependence to these pain medications.  He hid this dependence from his drug counselors and the government.  Unfortunately Itzkowitz supplemented his prescribed medications by acquiring these drugs illegally.

On May 25, 2010 when confronted with evidence that he had met with and individual named "Archie" with whom it was alleged Itzkowitz negotiated purchases of cocaine and pain medication Itzkowitz acknowledged these meetings.  At that time he admitted his dependence and abuse of pain medication and acknowledged discussing the acquisition of pain medication and cocaine from "Archie".  Itzkowitz was adamant and forthright in his acknowledgment that he wished to acquire pain medication from Archie and his denial of any intention of acquiring cocaine from him.  Indeed he described to the government that upon the receipt of an unsolicited sample of cocaine from Archie he threw it away.

The heart of the government's complaint with Itzkowitz was his failure to divulge this conduct and his acquisition of a cellular telephone to engage in his pursuit of non prescribed pain medication.  Significantly upon further confrontation on June 1, 2010 Itzkowitz candidly described the circumstances under which he acquired the telephone and the duration and purpose of its use.

The government contends that in light of these admissions "the government was not able to call the defendant as a witness" at the trial of Gary and Jeffrey Jacques.  It is the government's prerogative to determine what witnesses it intends to call at trial and it solely in the government's right to decide whether an individual has breached a cooperation agreement.  See United States v. Rexach, 896 F.2d 710 (2nd Cir. 1990).

However the prosecutor's broad discretion is not unlimited.  Rather it is constrained by the

implied obligation of good faith and fair dealing in every contract and therefore a

prosecutor's refusal to make a substantial assistance motion may not be made in bad faith. See

Rexach, 896 F.2d at 714.

In United States v. Brechner, 99 F.3d 96 (2nd Cir. 1996) the Court left open the possibility that

in some circumstances the government's conduct towards a cooperating witness after the witness's

breach of the agreement will prevent the government from later relying upon that breach to claim that

its obligations were nullified.  See Brechner, 99 F.3d at 100 n.1.

As discussed above once confronted Itzkowitz acknowledged every allegation made

concerning his contacts with "Archie", his acquisition of pain medication and his use of a cellular

telephone to do so.  Moreover Itzkowitz acknowledged his conduct sufficiently in advance of the trial

of the Jacques' to allow the government to both prepare for trial and prepare him as a witness for trial

in light of his admissions.

Consequently although the government contends they "were not able to call the defendant as

a witness" at the trial of Gary and Jeffrey Jacques, it is more accurate to state that the government

upon due deliberation *chose* not to call him as a witness.  That determination was likely the product

of their belief, confirmed by the outcome of the trial, that subsequent to Itzkowitz' cooperation (and

it submitted to a large extent as a direct result of information derived from his cooperation) sufficient

evidence was acquired to obtain their convictions absent Itzkowitz' testimony.

This conduct is very similar to the actions scrutinized in Brechner.  The Second Circuit

established the procedure for a claim of potential bad faith in United States v. Khan, 920 F. 2d 1100

(2nd Cir 1990).  In Khan the court stated that once the government explains the reasons why it will

refuse to make a substantial assistance motion the defendant must make a showing of bad faith

sufficient to trigger some form of hearing on the issue. As discussed above the defendant fully divulged his improper conduct prior to the trial of the Jacques thereby placing the government in a position to call him as a trial witness. The decision not to call him as a witness was based at least in part on the government's belief it possessed sufficient evidence to obtain the conviction of the Jacques without Itzkowitz' testimony. Significantly it is believed that absent Itzkowitz' early cooperation, the might have had difficulty presenting sufficient evidence in support of its application to extradite Gary Jacques from Haiti. Therefore absent his cooperation the leader of the organization that supplied the drugs sold by Itzkowitz might well have been thwarted following Jacques flight to that county in January 2008.

Therefore, the answer to the second question: What penalty is needed to restore the offender to moral standing within the community? See <u>United States v. Cole</u>, 662 F. Supp. 632, 637 (N.D. Ohio 2008) is likewise, that the maximum measure of further punishment to restore Itzkowitz to moral standing in the community is not warranted. He has taken the extraordinary step of assisting law enforcement in the investigation of those whose conduct most effects society, the narcotics suppliers themselves.

Itzkowitz has provided this information and participated in the pro-active investigation and now will not receive the benefit of a cooperation agreement.

Pre- <u>Booker</u>, in <u>United States v. Koon</u>, <u>supra</u>, the Supreme Court found that the Sentencing Reform Act allows district courts to consider aggravating or mitigating circumstances of a kind or to a degree not adequately taken into consideration by the Sentencing Commission. Justice Kennedy, writing for the Court advises that the Sentencing Commission has formulated each guideline to apply to a "heartland of typical cases". Atypical cases were "not adequately taken into consideration.

Koon, supra, See U.S.Cr.L. Vol. 59, at p.2135. It is submitted that Post-Booker, these same factors are relevant under 18 U.S.C. 3553 in determining whether a non-guideline variance is warranted.

Guideline section 5K2.0 permits the Court to impose a sentence outside of the applicable guideline range, "if the court finds that there exists a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines, that should result in a sentence different than that described".

It is submitted that a variance is warranted pursuant to 5K2.0, Title 18 United States Code Section 3553(a) and (e) and Title 28 United States Code section 994(n) based upon Mr. Itzkowitz's substantial assistance to law enforcement personnel in the investigation and successful prosecution of the supplier of the ammunition and that individual's accomplice as outlined above.

Title 28 United States Code section 994(n) directs the Sentencing Commission to insure that the Guidelines reflect the appropriateness of imposing a sentence lower than would otherwise be imposed to reflect a defendant's substantial assistance to law enforcement personnel. Yet, only Guideline section 5K1.1 and 18 U.S.C. section 3553(e) provide a mechanism for such consideration.

Both the statute and the Guideline mandate a motion by the Government prior to the Court even considering a downward departure. Absent such a motion there is no mechanism for the Court to consider Itzkowitz's assistance to law enforcement personnel. Therefore, pursuant to 18 U.S. C. 3553(a), 5K2.0 and 28 U.S.C. 994(n) the nature and extent of Itzkowitz's cooperation with Government authorities, as a mitigating circumstance in determining an appropriate sentence, is not adequately considered under the Guidelines.

In United States v. Garcia, 926 F.2d 125, the Second Circuit recognized that in some circumstances where the Government fails to live up to its promise made at the time of a plea to move

to request a downward departure, a defendant would and could receive a downward departure, where significant information had in fact been provided to the Government, pursuant to Guideline section 5K2.0. Given the extent of the information provided by the defendant, his complete and honest acceptance of responsibility it is respectfully submitted that this court should entertain such a variance.

Although pre-Booker the Supreme Court has twice addressed the substantial assistance motion requirement, see Melendez v. United States, 518 U.S. 120, 130-31 (1996); Wade v. United States, 504 U.S. 181, 18586 (1992), it has never decided whether a variance or departure might be appropriate when the government has not filed a motion under section 5K1.1.

The Second Circuit in U.S. v. Kaye, 94-1381 (2nd Cir. 3/16/98) held that a downward departure pursuant to U.S.S.G. 5K2.0 is permissible absent a government motion on the basis of a defendant's cooperation with state and local law enforcement authorities.

The Second Circuit in Kaye, in a decision which reflects that the Court was clearly troubled by the result, holds that a departure pursuant to U.S.S.G. 5K2.0 is permissible where a defendant provides substantial cooperation to local law enforcement authorities as opposed to federal authorities, in circumstances where the government does not file a motion pursuant to 5K1.1.

While specific 3553 analysis for post offense cooperation has not been directly addressed post Booker the Court of Appeals for the District of Colombia addresses the issue utilizing post-Koon analysis in In re: Sealed Case (Sentencing Guidelines' "Substantial Assistance") No.97-3112 (D.C.Cir. 7/24/98). The D.C.Circuit holds "that even where the government files no motion, Koon authorizes district courts to depart from the Guidelines based on a defendant's substantial assistance where circumstances take the case out of the relevant guideline heartland". Since Koon focused its

21

attention on 18 U.S.C. 3553 in interpreting the scope of the authority provided under U.S.S.G. 5K2.0 to impose a below guideline sentence as a "departure", certainly the same analysis is equally applicable in determining whether a below guideline "variance" is appropriate post <u>Booker</u>.

Clearly, the nature and extent of Itzkowitz's cooperation and the circumstances surrounding both the genesis of this investigation, his conduct, cooperation and both the anticipated and acknowledged fruits thereof are outside the "heartland" of typical cooperation scenarios.

Itzkowitz provided significant proactive cooperation which in fact led to the arrest, and prosecution of Gary and Jeffrey Jacques, the targets of the government's investigation. Indeed absent the defendant's assistance it is unlikely that the Jacques would have been Indicted and later successfully prosecuted.

Clearly from any objective evaluation Itzkowitz indeed provided substantial assistance to law enforcement authorities. It was informative, probative and in all likelihood significant. Without question such cooperation would be considered sufficient to warrant departure, were the government to make the motion. It is respectfully submitted that this Court for the reasons set forth above should Applying these standards to the facts of this case, it is submitted that the nature, the extent and the effect upon the defendant of his assistance warrants the Court imposing a non-guideline sentence.

Indeed the Second Circuit most recently in <u>United States v. Preacely</u>, 09-2580-cr (December 22, 2010) determined that in considering the appropriate sentence pursuant to 18 U.S.C. 3553 the district Court should take into consideration, post offense cooperation and efforts at rehabilitation in evaluating whether those factors evince a diminished likelihood of recidivism in arriving a sentence sufficient but not greater than necessary to accomplish the goals of 18 U.S.C. 3553.

**C. Analysis of the 3553(a) Factors Strongly Supports
   Imposition of a Non-Guideline Sentence**

18 U.S.C. 3553(a) additionally directs the sentencing court to consider the nature and

circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences

available, the guidelines sentencing range and policy statements, the need to avoid unwarranted

sentencing disparities amongst defendants involved in similar conduct with similar or lack of criminal

history, and the need to provide for restitution to any victim(s) of the offense.

The directives of United States v. Booker, 543 U.S. 220 (2005) United States v. Crosby, 397

F.3d 103 (2nd Cir. 205), and 3553(a) make clear that courts must consider all the factors in 355(a),

many of which the Guidelines either reject or ignore, or demand to an "extraordinary degree". Indeed,

in some cases, the Guidelines clash outright with 3553(a)'s primary directive: "to impose a sentence

sufficient but not greater than necessary to comply with the purposes" of sentencing.

As the Second Circuit observed in United States v. Jones, 551 F.3d 163, 182 (2d Cir 2008)

> it is the district court's particular trust to ensure the uniform and
> constant principle of the federal sentencing tradition, specifically,
> that "every convicted person [be considered] as an individual and
> every case as a unique study in the human failings that sometimes
> mitigates, sometimes magnify, the crime and the punishment to ensue."

Sentencing is not an exact science. Rather it is a fluid and dynamic process. Its aim should

be to impose a sentence that is reasonable and fair and just given the facts of a particular case and the

facts relative to the particular person being sentenced. See Rita v. United States, 551 U.S. 338 (2007),

Irizarry v. United States, 128 S.Ct. 2198 (2008). An analysis of the 3553(a) factors in this case

militates in favor of Jon Itzkowitz and the imposition of a sentence of less than the properly

calculated Guideline range of 41-51 months. As discussed herein an analysis of the 3553(a) factors

23

would warrant the imposition of a non-guideline sentence.

## II. Factors Warranting Imposition of Non-Guideline Sentence

In considering the imposition of a non-guideline sentence it is respectfully requested that the court consider the factors articulated in 18 U.S.C. 3553(a) as they apply to Jon Itzkowitz.

### A. *Nature and circumstances of the offense.*

The nature and circumstances of the defendant's participation in the offense are set forth in some detail in PSR's Paragraphs 3-5 and will not be repeated herein. What is significant is two factors. First the government would have been aware of little of this information absent Itzkowitz immediate and complete cooperation, thereby exposing himself to a greatly increased drug quantity and hence enhanced sentencing range. Second, Itzkowitz has not been involved in the distribution of narcotics for over three years. Moreover given his close family support, recognized drug dependency for which he has been receiving and shall continue to receive, the likelihood of his return to such criminal conduct is indeed remote.

### B. *The History and Characteristics of the Defendant*

As PSR Paragraphs 38-40 and the accompanying letters from his parents make amply clear Jon Itzkowitz has suffered from severe substance abuse problems since his early teen-age years. As the letters reveal both his parents were addicted to cocaine and alcoholics. They separated when he was 9 contemporaneous with the collapse of his father's commodity brokerage. The family's resulting financial instability coupled with his parents's substance abuse problems led to the family frequently moving and as a consequence the Itzkowitz had difficulty forming close friendships at school or in his neighborhood.

At age 14 he was diagnosed with Osgood-Schlatter disease causing severe knee and leg pain.

24

The disease had two substantial effects upon the defendant.  It prevented him from participating sports activities thereby eliminating the most common avenue to form peer friendships and led to obesity aggravating the disease and further diminishing his self-esteem.  Second, it led to his using and then abusing both prescribed and illegal drugs on a frequent basis at an abnormally young age, particularly in the suburban Suffolk County environment where he resided.

Itzkowitz abuse of drugs was not recognized by his similarly addicted parents.  Nonetheless, despite these difficulties Jon Itzkowitz was an above average student graduating high school timely and enrolled in Bridgeport University which he attended between 1999-2001.  Unfortunately his drug problems caught up with him leading to his expulsion in 2001 for smoking marijuana in a dormitory.

Upon his return to Long Island Itzkowitz resided with his mother, who after prolonged treatment became substance free and acquired employment in the health education department of SUNY Stony Brook.  Between 2001-2003 Itzkowitz worked on a full-time basis as a sales associate first at a local video store then Modell's, Home Depot and the Sport's Authority.   In 2003 while employed at Home Depot he severely fractured his wrist and was prescribed Vicodin for the pain.  While on leave his mother was diagnosed breast cancer and began undergoing an extensive treatment regimen.  As his mother discusses in her letter to the Court the combined factors had a toll on the defendant leading first to his abuse of Vicodin and then its sale to co-workers.  This represented Itzkowitz first entry into the illegal sale of drugs in 2003.

Between 2003 and his arrest Itzkowitz began a downward spiral of the abuse of pain medication, cocaine and marijuana.  This in turn led to his becoming involved in the sale first of the pain medication and later the sale of cocaine through the Jacques.

Following his arrest and release on conditions Itzkowitz as required attended out-patient drug

treatment at two locations, the Place, in Northport and the Huntington Drug and Alcohol Counseling Center in Huntington, New York.  As reflected from the annexed Progress Reports Itzkowitz fully participated and remained abstinent from cocaine and marijuana during the three year period.  (See Exhibit "C").

However, he continued to use opiate based prescribed pain medication during this same period of time which he acknowledged to the counselors and is evinced in his drug test results (Exhibit "C"). What was not known to the institutions or the government was the extent of Itzkowitz use and indeed abuse of the prescribed pain medication.[3]

While not offered as an excuse, but rather to allow the Court to better understand his conduct in both abusing the medication and failing to divulge it to the government, it is important for the Court  to be made aware that shortly after Itzkowitz commenced his cooperation his mother was diagnosed adenoid cancer.  While currently in remission the combined effects of his mother's status and weight of the case clearly impacted upon the defendant and led to his making improper choices in coping with the issues.   However, it must be stressed he did not return to the sale of any of these drugs.

The annexed letters from his parents, Denise and David Itzkowitz poignantly describe their battles with drug and alcohol dependency and how it affected the defendant.  The letter of his sister Kim provides insight into the kind of family man the defendant has demonstrated he can be.  His ability to become a thriving member of the community is similarly described in the description the letter of his neighbor June Harris explaining his care and compassion for her handicapped child and

---

[3] It is important to note that the majority of the opiates taken by the defendant were in fact prescribed by doctors Fakhuran N. Haqu and Okeke. (See PSR Paragraph 35).

his lifelong friend Police Officer Chris Connolly.  (See Exhibit "E" letters).  Similarly the letters from Meredith Cooper of the Huntington Youth Bureau's Drug and alcohol Project and Peggy Ward form the YMCA "The Place" substance abuse center reveal an individual whom with proper treatment can and will be vibrant member of the community. (See Exhibit "F").

## C. *Post-Offense Rehabilitation*

In the decisions of United States v. Workman, 80 F2d. 688 (2nd Cir.1996) and United States v. Maier, 975 F.2d 944, (2nd Cir., 1992), the Second Circuit has ruled that a downward departure, pursuant to Guideline section 5K2.0, based upon drug rehabilitation is permissible.  Most recently, in United States v. Core, 96-1790 (2nd Cir. 9/9/97) the Circuit held that a defendant's post-offense rehabilitation from narcotics addiction was a factor not adequately considered in the guidelines, and thus was a permissible basis for a downward departure.  The court states that "awareness of one's circumstances and a demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society can remove a case from the heartland of typical cases,  and thus constitute a valid basis for departure".  Again applying the analogy discussed above in the post-*Booker* era it is respectfully submitted that the Court may seek guidance in determining the appropriate sentence to impose in the context of the factors set forth in 18 U.S.C. 3553 by comparing how such a factor was considered pre-*Booker* in considering whether a departure pursuant to U.S.S.G. 5K2.0 was appropriate.

In both Core and Maier, supra, the Second Circuit, in evaluating the propriety of a lower sentence, premised upon a defendants efforts at narcotics rehabilitation, held that a defendant's rehabilitative efforts can, in an appropriate case, warrant a downward departure or in the alternative, creative utilization of the "Split sentence" provisions of Guideline sections 5B1.1 and 5C1.1.

27

In United States v. Maier, supra, the defendant, Beverly Maier, had entered a plea of guilty to a one count indictment charging her with distributing heroin and possessing heroin with intent to distribute it. Prior to her sentence, the defendant, an admitted heroin addict participated in a three week in patient detoxification program and subsequently entered a residential drug treatment program.

Drug tests administered by the Pre-trial Services Agency disclosed that Maier had used drugs between her arrest and the sentence. However, the rehabilitative reports indicated that such occurrences are generally the rule during rehabilitation, and that the defendant genuinely desired to rehabilitate herself as demonstrated by her continued progress in drug treatment programs.

Based on this evidence the district court found that Maier's efforts at rehabilitation were genuine and that she had attempted to rid herself of drug dependency. The district court stated that Maier would be unable to continue her drug treatment effectively if incarcerated. In these circumstances, Judge Sweet concluded that it was appropriate to depart downward from the applicable guideline range and, to that end imposed a sentence of four years probation during which time Maier was required to participate in community drug treatment programs.

It is respectfully submitted that Jon Itzkowitz stands in a similar position as did Beverly Maier and Xavier Reyes in the Core, supra decisions. He has been attending weekly individualized counseling at two locations, the Place, in Northport and the Huntington Drug and Alcohol Counseling Center in Huntington, New York. As reflected from the annexed Progress Reports Itzkowitz fully participated and remained abstinent from cocaine and marijuana during the three year period. (See Exhibit "C").

More significantly continuity of treatment is deemed essential to his mental health. It is therefore submitted that this case likewise warrants the court's consideration in fashioning an

appropriate sentence due to the defendant's history of drug dependence, his rehabilitative efforts and

the nature and circumstances of the offence for which he stands convicted.

### 3. *The Kinds of Sentences Available*

A sentencing Court must consider all of the "kinds of sentences available" by statute, 3553(a),

even if the "kinds of sentences...established [by] the Guidelines permit or encourage only prison.  See

<u>Gall</u>, 128 S.Ct. at 602 & n.11.  Here, because Jon Itzkowitz plead guilty to a violation of 21 U.S.C.

841(b)(1)(B) and has satisfied the requirements of  U.S.S.G. 2D1.1(b)(11) and 5C1.2 thereby

qualifying for relief from the statutory mandatory minimum penalties, the Court may impose whatever

sentence the Court considers appropriate and sufficient in this case.

### 4. *The Guidelines Sentencing Range and Guidelines Policy Statements*.

The Supreme Court's decisions in <u>Booker/Fanfan</u> requires sentencing courts to treat the

Guidelines as one of a number of factors in sentencing pursuant to 18 U.S.C. 3553(a).  As the

Supreme Court held, the now revised Sentencing Reform Act ("SRA")

> requires a sentencing court to consider Guidelines ranges, see
> 18 U.S.C. 3554(a)(4)(Supp.2004) but it permits the court to tailor
> the sentence in light of other statutory concerns as well, see 3553(a).
> <u>Booker</u>, 125 S.Ct. at 757.

As discussed in some detail above the nature and extent of Jon Itzkowitz's cooperation and

the circumstances surrounding both the genesis of this investigation, his conduct, cooperation  and

both the anticipated and acknowledged fruits thereof are outside the "heartland" of typical cooperation

scenarios.

Clearly from any objective evaluation Jon Itzkowitz indeed provided substantial assistance

to law enforcement authorities.  It was informative, probative and in all likelihood significant.

Without question such cooperation would be considered sufficient to warrant departure, were the

government to make the motion. It is respectfully submitted that this Court for the reasons set forth above should Applying these standards to the facts of this case, it is submitted that the nature, the extent and the effect upon the defendant of his assistance warrants the Court imposing a non-guideline sentence.

### 5. *The Need to Avoid Sentencing Disparity.*

Imposition of a non-Guidelines sentence in this case will not create an sentencing disparities, either nationally or locally.  Indeed, the denial of some form of consideration for Jon Itzkowitz 's substantial assistance in the investigation of weapons suppliers could well be considered as a factor creating sentencing disparity between he and similarly situated individuals who provided similar if not identical assistance for whom the government made a motion pursuant to U.S.S.G. 5K1.

### 7. *The Need to Provide Restitution.*

The need to provide restitution is not a factor in this case.

### 8. *Reflecting the Seriousness Of the Offense, Promoting Respect for the Law, Providing Just Punishment, Deterring Criminal Conduct, Protecting the Public, and Providing Vocational Training.*

A non-guidelines sentence will afford the defendant sufficient opportunities to improve his education, work skills and employment opportunities while facilitating effective drug treatment, which appears to be the core of his difficulties.

Consideration of all of the factors contained in 18 U.S.C. 3553(a), it is submitted, permits the Court to impose a non-Guidelines sentence for Jon Itzkowitz.  His profile given all the circumstances relative to Jon Itzkowitz, his life and his offense conduct militate in favor of some lenity.

## III. **CONCLUSION**

When the Court imposes sentence upon a person, it naturally takes into account many factors, including the traditional objectives of deterrence, punishment and rehabilitation, carefully balanced by the gravamen of the offense, the defendant's culpability, his background and any particular factors about the defendant that should and do demand special attention.

The Court is well aware of the facts of this case, having been provided the extensive case history set forth in the Presentence Report and this document and therefore such will not be reviewed any further herein. In determining the sentence to be imposed, the court is faced with the task of balancing society's interests with those of the defendant. In analyzing that juxtaposition, we would impress upon the Court Jon Itzkowitz's background, the nature and circumstances of his participation in the offense, his close family ties, and above all the objective evidence of his post offense rehabilitation, most notably his cooperation with law enforcement authorities.

The imposition of a non-guideline sentence would clearly conform with the statutory goals of 18 U.S.C. 3553.

Indeed, the rationale of such a sentence comports with Judge Hellerstein's eloquent statement on the goal of rehabilitation in sentencing which bears repeating.

> Rehabilitation is also a goal of punishment 18 U.S.C.
> 3553(a)(2)(D). That goal cannot be served if a defendant can
> look forward to nothing beyond imprisonment. Hope is the
> necessary condition of mankind, for we are all created in the image
> of God. A judge should be hesitant before sentencing so severely
> that he destroys all hope and takes away all possibility of useful
> life. Punishment should not be more severe than that necessary to
> satisfy the goals of punishment.

United States v. Carajal, 2005 WL 476125 (SDNY February 22, 2005).

31

These are indeed the type of factors that 18 U.S.C. 3553(a) and in the post Booker era Gall v. United States, 552 U.S. 85 (2007), Kimbrough v. United States, 552 U.S. 85 (2007) and United States v. Crosby, supra mandate that the court consider in imposing sentence. This case does not involve violence nor firearms. Jon Itzkowitz asks that the Court consider these factors in determining what sentence should be imposed.

Respectfully submitted,

Alan Nelson

cc: AUSA Gina Parlovecchio (ecf)
    USPO Victoria Aguilar (facsimile)
    Jon Itzkowitz (U.S. Mail)

EXHIBIT "A"

CH:EJM
F. #2007R00642

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

JON ITZKOWITZ,

          Defendant.

- - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. 484 (NG)

(T. 21, U.S.C.,
§§ 846 and
841(b)(1)(B)(ii)(II);
T. 18, U.S.C., §§ 3551
et seq.)

THE UNITED STATES ATTORNEY CHARGES:

        On or about March 16, 2007, within the Eastern District of New York, the defendant JON ITZKOWITZ, together with others, did knowingly and intentionally conspire to possess with intent to distribute a controlled substance, which offense involved 500 grams or more of a substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

        (Title 21, United States Code, Sections 846 and 841(b)(1)(B)(ii)(II); Title 18, United States Code, Sections 3551 et seq.)

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

EXHIBIT "B"

JK:EOM
F. #2007R00662

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    COOPERATION AGREEMENT

    - against -                             07 CR ___

JON ITZKOWITZ,

                Defendant.

- - - - - - - - - - - - - - - -X

        Pursuant to Rule 11 of the Federal Rules of Criminal

Procedure, the United States Attorney's Office for the Eastern

District of New York (the "Office") and JON ITZKOWITZ (the

"defendant") agree to the following:

        1.    The defendant will waive indictment and plead guilty

to an information to be filed in this district charging a violation

of 21 U.S.C. § 846.    The count carries the following statutory

penalties:

        a.    Maximum term of imprisonment: 40 years
              (21 U.S.C. § 841(b)(1)(B)(ii)(II)).

        b.    Minimum term of imprisonment: 5 years
              ( 21 U.S.C. § 841(b)(1)(B)(ii)(II)).

        c.    Minimum supervised release term: 4 years,
              maximum supervised release term: life, to
              follow any term of imprisonment; if a
              condition of release is violated, the
              defendant may be sentenced to up to 3 years
              without credit for pre-release imprisonment or
              time previously served on post-release
              supervision
              (18 U.S.C. § 3583(e); 21 U.S.C. § 841)

2

    d.    Maximum fine: $2,000,000
        (21 U.S.C. § 960 (b)(3)).

    e    Restitution: N/A
        (18 U.S.C. § 3663).

    f    $100 special assessment
        (18 U.S.C. § 3013)

    8    The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including all criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. Based on information known to it now, the Office will not oppose a downward adjustment of three levels for acceptance of responsibility under U.S.S.G. § 3E1.1. The defendant agrees not to challenge the drug type or amount set forth in the lab report.

    9.    The defendant will provide truthful, complete and accurate information and will cooperate fully with the Office. This cooperation will include, but is not limited to, the following:

    a.    The defendant agrees to be fully debriefed and to attend all meetings at which his presence

is requested, concerning his participation in and knowledge of all criminal activities.

b.     The defendant agrees to furnish to the Office all documents and other material that may be relevant to the investigation, and that are in the defendant's possession or control and to participate in undercover activities pursuant to the specific instructions of law enforcement agents or this Office.

c.     The defendant agrees not to reveal his cooperation, or any information derived therefrom, to any third party without prior consent of the Office.

d     The defendant agrees to testify at any proceeding in the Eastern District of New York or elsewhere as requested by the Office.

e.     The defendant consents to adjournments of his sentence as requested by the Office.

4.   The Office agrees that:

a.     Except as provided in paragraphs 1, 8 and 9, no criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity involving the distribution and conspiracy to distribute and possession with intent to distribute cocaine on or about March 16, 2007.

b.     No statements made by the defendant during the course of this cooperation will be used against him except as provided in paragraphs 1, 8, and 9.

5.   The defendant agrees that the Office may meet with and debrief him without the presence of counsel, unless the defendant specifically requests counsel's presence at such debriefings and meetings.  Upon request of the defendant, the Office will endeavor to provide advance notice to counsel of the

4

place and time of meetings and debriefings, it being understood that the Office's ability to provide such notice will vary according to time constraints and other circumstances. The Office may accommodate requests to alter the time and place of such debriefings. It is understood, however, that any cancellations or reschedulings of debriefings or meetings requested by the defendant that hinder the Office's ability to prepare adequately for trials, hearings or other proceedings may adversely affect the defendant's ability to provide substantial assistance. Matters occurring at any meeting or debriefing may be considered by the Office in determining whether the defendant has provided substantial assistance or otherwise complied with this agreement and may be considered by the Court in imposing sentence regardless of whether counsel was present at the meeting or debriefing.

6.   If the Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will file a motion pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) with the sentencing Court setting forth the nature and extent of his cooperation. Such a motion will allow the Court, in its discretion, to impose a sentence below the applicable mandatory minimum sentence. In this connection, it is understood that a good faith determination by the Office as to whether the defendant has cooperated fully and provided substantial

assistance and has otherwise complied with the terms of this agreement, and the Office's good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him. The defendant agrees that, in making this determination, the Office may consider facts known to it at this time. The Office will not recommend to the Court a specific sentence to be imposed. Further, the Office cannot and does not make a promise or representation as to what sentence will be imposed by the Court.

7. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 4(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

8. The defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit or attempt to commit any further crimes. Should it be judged by the Office that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this

6

agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including a) not to oppose a downward adjustment of three levels for acceptance of responsibility described in paragraph 2 above, and (b) to file the motion described in paragraph 6 above. Moreover, this Office may withdraw the motion described in paragraph 6 above, if such motion has been filed prior to sentencing. The defendant will also be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the criminal activity described in paragraph 4 above, perjury and obstruction of justice.

9. Any prosecution resulting from the defendant's failure to comply with the terms of this agreement may be premised upon, among other things: (a) any statements made by the defendant to the Office or to other law enforcement agents on or after March 15, 2007; (b) any testimony given by him before any grand jury or other tribunal, whether before or after the date this agreement is signed by the defendant; and (c) any leads derived from such statements or testimony. Prosecutions that are not time-barred by the applicable statutes of limitation on the date this agreement is signed may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statutes of limitation between the signing of this agreement and the commencement of any such prosecutions. Furthermore, the defendant

7

waives all claims under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, that statements made by him on or after September 6, 2006, or any leads derived therefrom, should be suppressed.          9/6/07

10.   This agreement does not bind any federal, state, or local prosecuting authority other than the Office and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

11.   No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties.   This agreement supersedes any prior promises,

3

agreements or conditions between the parties.  To become effective,

this agreement must be signed by all signatories listed below

Dated:    Brooklyn, New York
                    , 2007

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York

By: _____
Elizabeth J. Mackay
Assistant United States Attorney

Approved by:

_____
Colleen Kavanagh
Supervising Assistant U.S. Attorney

I have read the entire agreement and discussed it with my attorney. I
understand all of its terms and am entering into it knowingly and
voluntarily.

_____
JON ITZKOWITZ
Defendant

Approved by:

_____
Alan M. Nelson
Counsel to Defendant

EXHIBIT "C"

UNITED STATES PRETRIAL SERVICES AGENCY
Eastern District of New York

# MONTHLY TREATMENT REPORT

| Program/Treatment Provider | YMCA the Place |
| | 324 Main St. Northport, NY 11748 |
| Client | Jon Itzkowitz |
| Month | September 2007 |

### CONTACTS SINCE LAST REPORT

| Date | Service Provided (Indiv, Group, etc) | Length of Contact | Comments |
|------|--------------------------------------|-------------------|----------|
| 9-6-07 | Group - Ed Series | 1½ Hours | No Show |
| 9-13-07 | Group - Ed Series | 1½ Hours | Participated |
| 9-20-07 | Group - Ed Series | 1½ Hours | Participated |
| 9-27-07 | Group - Ed Series | 1½ Hours | Participated |

### COMMENTS REGARDING CLIENT'S TREATMENT PROGRESS

There has been some confusion setting schedule
for Jon as not to cross with Anthony Fusillo, who
is also in this program. Jon is also scheduled
for a therapy group, but has yet to get
schedule so to attend. This should all be
worked out in the next few weeks.

| Signature of Counselor | Charles Ruff, CMSW | Date 10/1/07 |

Please mail or fax report to:

Timothy J. Rooney
U.S. Pretrial Services Office

PRETRIAL SERVICES
UNITED STATES DISTRICT COURT
225 CADMAN PLAZA
BROOKLYN, NY 11201

TEL (718) 260-9467
FAX (718) 260-6455

UNITED STATES PRETRIAL SERVICES AGENCY
Eastern District of New York

## MONTHLY TREATMENT REPORT

| Program/Treatment Provider | YMCA The Place 324 Main St, Northport NY 11768 |
| Client | Jon Itzkowitz |
| Month | October 2007 |

### CONTACTS SINCE LAST REPORT

| Date | Service Provided (Ind., Group, etc.) | Length of Contact | Comments |
|------|--------------------------------------|-------------------|----------|
| 10-4-07 | GROUP - ED SERIES | 1½ Hours | PARTICIPATED |
| 10-11-07 | GROUP - ED SERIES | 1½ Hours | PARTICIPATED |
| 10-17-07 | GROUP - RECOVERY | 1½ Hours | PARTICIPATED |
| 10-18-07 | GROUP - ED SERIES | 1½ Hours | PARTICIPATED |
| 10-24-07 | GROUP - RECOVERY | --- | CANCELLED |
| 10-25-07 | GROUP - ED SERIES | --- | CANCELLED |
| 10-31-07 | GROUP - RECOVERY | 1½ Hours | PARTICIPATED |

### COMMENTS REGARDING CLIENT'S TREATMENT PROGRESS

JON'S SCHEDULE HAS NOW BEEN WORKED OUT
TO AVOID CONTACT WITH ANTHONY FORESTA WHO
IS ALSO IN THIS PROGRAM. JON DID CANCEL TWO
SESSIONS IN A ROW BUT MADE ALL OTHERS
AND DOES PARTICIPATE IN THE GROUP PROCESS
THERE WAS NO DRUG TEST COMPLETED THIS
MONTH. JON HAS BEEN IN COMPLIANCE WITH
AGENCY POLICY.

| Signature of Counselor | Date |
|------------------------|------|
| _[signature]_ LMSW | 11/5/07 |

Please mail or fax report to:
TIMOTHY J. ROONEY
U.S. PRETRIAL SERVICES OFFICER

# UNITED STATES PRETRIAL SERVICES AGENCY
## Eastern District of New York

# MONTHLY TREATMENT REPORT

| Program/Treatment Provider | YMCA 362 Place 324 Main St. Northport, NY 11267 |
|---|---|
| Client | Jon Trakowtz |
| Month | December 2007 |

### CONTACTS SINCE LAST REPORT

| Date | Service Provided (Ind., Group, etc.) | Length of Contact | Comments |
|---|---|---|---|
| 12/5/07 | Recovery Group | 90 min | |
| 12/8/07 | Education Group | 90 min | |
| 12/12/07 | Recovery Group | 90 min | |
| 12/15/07 | Recovery Group | 90 min | |
| 12/22/07 | Education Group | 90 min | |
| 12/26/07 | Recovery Group | 90 min | |
| | | | |
| | | | |

### COMMENTS REGARDING CLIENT'S TREATMENT PROGRESS

Jon failed to cancel session on 12/12. He attend all other sessions as scheduled. Jon is making progress towards goals.

| Signature of Counselor | Date |
|---|---|
| | 3/24/08 |

Please mail or fax report to:

Timothy J. Rooney
U.S. Pretrial Services Officer

U.S. PRETRIAL SERVICES
UNITED STATES COURTHOUSE
One Pierrepont Plaza
Brooklyn, New York 11201          TEL (631) 712-6400
                                  FAX (631) 712-6413

UNITED STATES PRETRIAL SERVICES AGENCY
Eastern District of New York

# MONTHLY TREATMENT REPORT

| Program/Treatment Provider | VMCG The Place 324 Main St Northport NY 11768 |
|---|---|
| Client | Jon Itzkowitz |
| Month | January 2008 |

### CONTACTS SINCE LAST REPORT

| Date | Service Provided (Ind., Group, etc.) | Length of Contact | Comments |
|---|---|---|---|
| 1/9/08 | recovery group | 90 min | |
| 1/10/08 | education group | 90 min | |
| 1/16/08 | recovery group | 90 min | |
| 1/17/08 | education group | 90 min | |
| 1/23/08 | recovery group | 90 min | |
| 1/24/08 | education group | 90 min | |
| 1/31/08 | individual | 30 min | |

### COMMENTS REGARDING CLIENT'S TREATMENT PROGRESS

Jon called to cancel session on 1/2/08. He successfully completed education group this month. He has been transferred to Transitions program and will work with Jon Itzkowitz to make steady progress toward goals.

Signature of Counselor _[signature]_   Date 1/24/08

Please mail or fax report to:

Timothy J. Rooney
U.S. Pretrial Services Officer

Alphonse M. D'Amato
United States Courthouse
200 Federal Plaza
Central Islip NY 11722

TEL (631) 712-6400
FAX (631) 712-6410

UNITED STATES PRETRIAL SERVICES AGENCY
Eastern District of New York

# MONTHLY TREATMENT REPORT

| | |
|---|---|
| Program/Treatment Provider | YMCA The Place<br>324 Main St Westfield, NJ 07090 |
| Client: | Lin Ito Bruits |
| Month | February 2008 |

## CONTACTS SINCE LAST REPORT

| Date | Service Provided (Ind., Group, etc.) | Length of Contact | Comments |
|---|---|---|---|
| 2/7/08 | Individual | 50 min | |
| 2/13/08 | Recovery group | 90 min | |
| 2/14/08 | Individual | 50 min | |
| 2/20/08 | Recovery group | 90 min | |
| 2/21/08 | Individual | 50 min | |
| 2/27/08 | Recovery group | 90 min | |
| | | | |
| | | | |
| | | | |

## COMMENTS REGARDING CLIENT'S TREATMENT PROGRESS

Lin was a 'no show, no call' for group on 2/6/08. He attended + participated in all other sessions as scheduled. He continues to make progress in treatment

Signature of Licensee or [illegible signature] | Date 4/24/08

Please return by fax [illegible]

Timothy J. Rodney
U.S. Pretrial Services Officer

[illegible]
United States Courthouse
100 Federal Plaza
Central Islip NY 11722

Tel [illegible]
Fax [illegible]

UNITED STATES PRETRIAL SERVICES AGENCY
Eastern District of New York

# MONTHLY TREATMENT REPORT

| Program/Treatment Provider | YMCA The Place, 39 Main St Nyack NY 10023 |
|---|---|
| Client | Mr. Horowitz |
| Month | March 2008 |

| CONTACTS SINCE LAST REPORT | | | |
|---|---|---|---|
| Date | Service Provided (Ind., Group, etc.) | Length of Contact | Comments |
| 3/5/08 | Recovery Group | 90 min | |
| 3/12/08 | Recovery Group | 90 min | |
| 3/19/08 | Indiv Session | 50 min | |
| 3/26/08 | Indiv Session | 50 min | |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| COMMENTS REGARDING CLIENT'S TREATMENT PROGRESS: |
|---|
| Failed to cancel session on 3/6/08 and 3/13/08. The remaining sessions on 3/19/08 due to travel. No no full participation and rescheduled sessions. |
|  |
|  |

Signature/Counselor _____ Date 4/24/08

Please mail or fax report to:

TIMOTHY J. ROONEY
U.S. Pretrial Services Officer

UNITED STATES PRETRIAL SERVICES AGENCY
Eastern District of New York

# MONTHLY TREATMENT REPORT

| Program/Treatment Provider | YMCA The Place _East Main St. Smithtown NY 11701_ |
|---|---|
| Client | _Jon Stolowitz_ |
| Month | _April 2008_ |

| CONTACTS SINCE LAST REPORT | | | |
|---|---|---|---|
| Date | Service provided (Indv, Group, etc.) | Length of Contact | Comments |
| 4/3/08 | Individual | 50 min | |
| 4/10/08 | Mens group | 90 min | |
| 4/17/08 | Mens group | 90 min | |
| 4/24/08 | Individual | 50 min | |
| | | | |
| | | | |
| | | | |
| | | | |

| COMMENTS REGARDING CLIENT'S TREATMENT PROGRESS |
|---|
| _YMCA The Place Cancelled session on 4/3/08, 4/10/08, & 4/17/08. Jon called to_ _Cancel session on 4/3/08 and wished_ _Jon continues to demonstrate compliance_ _with 4/3/08 positive for opiates. Jon has provided_ _documentation of proper prescription_ |

| Signature of therapist | _____ | Date _4/24/08_ |

UNITED STATES PRETRIAL SERVICES AGENCY
Eastern District of New York

## MONTHLY TREATMENT REPORT

| Program/Treatment Provider | YMCA The Place 364 Mass. Northport NY 11768 |
|---|---|
| Client | Jon Izakowitz |
| Month | May 2008 |

| CONTACTS SINCE LAST REPORT | | | |
|---|---|---|---|
| Date | Service Provider (Indiv, Group, etc.) | Length of Contact | Comments |
| 5/1/08 | Agency Closed | — | |
| 5/11/08 | Patient cancelled | — | |
| 5/8/08 | Patient cancelled | — | |
| 5/14/08 | Recovery group | 90 | Refused UDS |
| 5/15/08 | Patient cancelled | — | |
| 5/21/08 | Recovery group | 90 | Participated |
| 5/22/08 | Individual | 50 | Participated |
| 5/28/08 | Recovery group | 90 | Participated |
| 5/29/08 | Individual | 55 | Participated |

**OFFICER'S COMMENTS REGARDING CLIENT'S TREATMENT PROGRESS:**

Since you spoke with Jon about his attitude/participation with program he has demonstrated a favorable change in behavior. Jon's attendance had gradually improved. At client Jon was encouraged to take program more seriously & he has done so. Jon has opened up in group & also in individual sessions. Jon seems to be bonding well with me and counselor & is taking suggestions. I believe Jon can benefit from continued IOP & continued therapy. Please contact me if you have any questions. Thank you.

Signature of Counselor _____ Date 6/5/08

Timothy J. Rodier
U.S. Pretrial Services Officer

# BENDINER & SCHLESINGER INC.

## MEDICAL LABORATORIES

02 27 QC 206

BROOKLYN, NY   11220

| REPORT DATE | DOCTOR/INSTITUTION | DR. SIGNATURE | PATIENT | PAGE |
|---|---|---|---|---|
| 0( /08 | YMCA-FAMILY SVCE CTR-NORTHPORT<br>324 MAIN STREET<br>ATTN. SHARON BERLETH<br>NORTHPORT, NY  11768 | 05/21/08 | ITZKOWITZ, JON | 27 |
| PATIENT NUMBER<br>TC815030S0<br>29-3050 | | DATE/TIME RECEIVED<br>05/29/08<br>04:53PM | SS#: 05/25/1981 | SEX<br>M |

| TEST | ABN | RESULT | UNITS | REF RANGE | | TEST | ABN | RESULT | UNITS | REF RANGE |
|---|---|---|---|---|---|---|---|---|---|---|
| ******* | | TOXICOLOGY | ******** | | | | | | | |
| METHADONE,EIA | | NEG | ng/ml | 300 | | | | | | |
| OPIATE,EIA | * | POS | ng/ml | 300 | | | | | | |
| COCAINE,EIA | | NEG | ng/ml | 300 | | | | | | |
| BARBITURATE,EIA | | NEG | ng/ml | 300 | | | | | | |
| BENZODIAZEPINE,<br>EIA | | NEG | ng/ml | 300 | | | | | | |
| PROPOXYPHENE,<br>EIA | | NEG | ng/ml | 300 | | | | | | |
| PHENCYCLIDINE,<br>EIA | | NEG | ng/ml | 25 | | | | | | |
| AMPHETAMINE,EIA | | NEG | ng/ml | 1000 | | | | | | |
| CANNABINOIDS,<br>EIA | | NEG | ng/ml | 50 | | | | | | |
| ALCOHOL,ADH | | NEG | mg/dL | 100 | | | | | | |
| CREATININE,<br>URINE | | 1214 | mg/dL | 20-350 | | | | | | |
| ***************** | | | | | | | | | | |

```
*****************
This is a        *
screening test*
only. POSITIVE*
results are not
confirmed by   *
GC/MS unless   *
requested
separately.    *
Please notify *
B&S within 14 *
days. Fax to:  *
212-529-6662  *
212-598-0907  *
or call
212-254-2300  *
option [2]
*****************
```

OF REPORT                    QC 206

WILLIAM J. OLDSSON, PH.D.<br>LABORATORY DIRECTOR

DAVID SOHN, M.D.<br>ASSOCIATE DIRECTOR

DAVID Y. ZHANG, M.D., PH.D., MPH<br>ASSOCIATE DIRECTOR

FOAD S. BASCH, M.D.<br>ASSOCIATE DIRECTOR, CHEMISTRY DEPT.

# BENDINER & SCHLESINGER INC.

## MEDICAL LABORATORIES

BROOKLYN, NY 11240

11 42 QC 1365

| | | | |
|---|---|---|---|
| DATE | 04/__/08 | DOCTOR/INSTITUTION YMCA-FAMILY SVCE CTR-NORTHPORT | PATIENT ITZKOWITZ, JON | AGE 25 |
| PATIENT NUMBER T081003185 9-3185 | | G24 MAIN STREET ATN:MR. KEN SCOTTO NORTHPORT, NY 11768 | 126787241 | SEX M |
| | | | DOB-05/25/1981 | |

DATE DRAWN 04/09/08  
DATE/TIME RECEIVED 04/09/08 -05:50PM

| TEST | ABN | RESULT | UNITS | REF RANGE | TEST | ABN | RESULT | UNITS | REF RANGE |
|---|---|---|---|---|---|---|---|---|---|
| ******* TOXICOLOGY ****** | | | | | | | | | |
| METHADONE,EIA | | NEG | ng/ml | 300 | | | | | |
| OPIATE,EIA | * | POS | ng/ml | 300 | | | | | |
| COCAINE,EIA | | NEG | ng/ml | 300 | | | | | |
| BARBITURATE,EIA | | NEG | ng/ml | 300 | | | | | |
| BENZODIAZEPINE, EIA | | NEG | ng/ml | 300 | | | | | |
| PROPOXYPHENE, EIA | | NEG | ng/ml | 300 | | | | | |
| PHENCYCLIDINE, EIA | | NEG | ng/ml | 25 | | | | | |
| AMPHETAMINE,EIA | | NEG | ng/ml | 1000 | | | | | |
| CANNABINOIDS, EIA | | NEG | ng/ml | 50 | | | | | |
| ALCOHOL,ADH | | NEG | ng/dL | 50 | | | | | |
| CREATININE, URINE | | 157 | mg/dL | 20-350 | | | | | |
| *** ********** | | | | | | | | | |

```
********************
This is a         *
screening test*
only. POSITIVE*
results are not
confirmed by   *
GC/MS unless   *
requested
separately.
Please notify *
985 within 14 *
days. Fax to: *
212-529-6662  *
212-598-0907  *
or call
212-254-2300  *
option [2]
********************
```

OF REPORT

QC 1365

WILLIAM I GLOBUS PH.D  
DAVID BOHN M.D.  
DAVID Y ZHANG M.D. PH.D. MPH  
ROSS S BASCH M.D.

# BENDINER & SCHLESINGER INC.

## MEDICAL LABORATORIES

### 26 3 QC 1709

| | |
|---|---|
| REC'D 02. /98 | DESTINATION YMCA-FAMILY SVCE CTR-NORTHPORT 324 MAIN STREET ATN:MR. KEN SCOTTO NORTHPORT,NY 11768 |
| PATIENT NUMBER T080563B11 26-3811 | DATE DRAWN 02/21/08 |
| | DATE VERIFIED 02/26/08 07:35PM |

PATIENT: ITZKOWITZ, JON

116787241

DOB: 05/28/1961

| TEST | ABN | RESULT | UNITS | REF RANGE | TEST | ABN | RESULT | UNITS | REF RANGE |
|---|---|---|---|---|---|---|---|---|---|
| **TOXICOLOGY** | | | | | | | | | |
| METHADONE,EIA | * | NEG | ng/ml | 300 | | | | | |
| OPIATE,EIA | * | POS | ng/ml | 300 | | | | | |
| COCAINE,EIA | | NEG | ng/ml | 300 | | | | | |
| BARBITURATE,EIA | | NEG | ng/ml | 300 | | | | | |
| BENZODIAZEPINE, EIA | | NEG | ng/ml | 300 | | | | | |
| PROPOXYPHENE, EIA | | NEG | ng/ml | 300 | | | | | |
| PHENCYCLIDINE, EIA | | NEG | ng/ml | 25 | | | | | |
| AMPHETAMINE,EIA | | NEG | ng/ml | 1000 | | | | | |
| CANNABINOIDS, EIA | | NEG | ng/ml | 50 | | | | | |
| ALCOHOL,ADH | | NEG | mg/dL | 50 | | | | | |
| CREATININE, URINE | | 217 | mg/dL | 20-380 | | | | | |

```
***************
This is a      *
Screening test *
only. POSITIVE *
results are not
confirmed by   *
GC/MS unless   *
requested      *
separately     *
Please notify  *
B&S within 14  *
days. Fax to:  *
212-529-6662   *
212-598-0907   *
or call        *
212-264-2300   *
option [2]     *
***************
```

E.  OF REPORT                                    QC 1709

WILLIAM CLOSSON, PH.D.

DAVID SOHN, M.D.

DAVID ZHANG, M.D. PH.D.

ROGER S. BASCH, M.D.

# BENDINER & SCHLESINGER INC.

## MEDICAL LABORATORIES

24 55 20 285

| COLLECT DATE | CUSTOMER INFORMATION | RECEIVED DATE | PATIENT | PAGE |
|---|---|---|---|---|
| 24/08 | YMCA-FAMILY SVCE CTR NORTHPORT<br>224 MAIN STREET<br>ATTN:MR. KEN SCOTTO<br>NORTHPORT NY 11768 | 01/10/08<br>2004 | ITZKOWITZ, JON | 25 |
| ACCESSION NUMBER<br>T080224526<br>22 4626 | | DATE PRINTED TIME<br>01/22/08<br>08:47AM | 11678724L<br>DOB: 05/25/1981 | SEX<br>M |

| TEST | ABN | RESULT | UNITS | REF RANGE | TEST | ABN | RESULT | UNITS | REF RANGE |
|---|---|---|---|---|---|---|---|---|---|
| **\*\*\*\*\*\*\*\*\*\*** | | TOXICOLOGY | \*\*\*\*\*\*\*\*\*\* | | | | | | |
| METHADONE, EIA | | NEG | ng/ml | 300 | | | | | |
| OPIATE, EIA | * | POS | ng/ml | 300 | | | | | |
| COCAINE, EIA | | NEG | ng/ml | 300 | | | | | |
| BARBITURATE, EIA | | NEG | ng/ml | 300 | | | | | |
| BENZODIAZEPINE,<br>EIA | | NEG | ng/ml | 300 | | | | | |
| PROPOXYPHENE,<br>EIA | | NEG | ng/ml | 300 | | | | | |
| PHENCYCLIDINE<br>EIA | | NEG | ng/ml | 25 | | | | | |
| AMPHETAMINE,EIA | | NEG | ng/ml | 1000 | | | | | |
| CANNABINOIDS,<br>EIA | | NEG | ng/ml | 50 | | | | | |
| ALCOHOL,ADH | | NEG | mg/dL | 50 | | | | | |
| CREATININE,<br>URINE | | 166 | mg/dL | 20-350 | | | | | |
| \*\*\*\*\*\*\*\*\*\*\*\*\* | | | | | | | | | |

\*\*\*\*\*\*\*\*\*\*\*
This is a
Screening test\*
only. POSITIVE\*
results are not
confirmed by \*
GC/MS unless \*
requested \*
separately. \*
Please notify \*
B&S within 7 \*
days. Fax to. \*
212-529-6662 \*
212-698-0907 \*
(or call (2) \*
212-254-2300 \*
\*\*\*\*\*\*\*\*\*\*\*

END OF REPORT                    QC 246

BERATA H. PONDA, M.D., M.D.A.P.    DAVID SCHR, M.D.    PAUL SALA, D.D.SSON,PH.D    ROSS S. GANDHI, M.D.

EXHIBIT "D"

```
                        470 VILLAGE PHARMACY
                           11 BROADWAY
                        GREENLAWN, NY  11740
                            (631 ____)

      *** Patient Profile for 11/08/2017, RX Date Range 05/01/10 to 07/31/10 ***                    Page: 1


Client              Phone       Dr Group       Wagner        Biver  Plan   MthVol
Address     Notes               Cardholder     Relate  Exponate Rx Dis RetVal
City, State Zip     Birthday Gav.      Headerhousehold      Account# Ucopay  Ucopay YtVol
=========================================================================================
HOROWITZ, JON          (631)     245  DR  FIRST CUSTOMER]  Discount = 0%                103
210 CLAY PITTS RD                                       01/01/00 0  0 %        TAX
EAST NORTHPORT, NY 11731  05/25/1981 M                                         103


Retail price includes that of the patient's PRIMARY insurance plan and, (if applicable) SECONDARY insurance plan.

Script #   Drug Name            Strength Frm   Quant Rx Date  Doctor Name       CC IssnoDay Phr Ps Rn  UsRetail  Copay
=========================================================================================
0175590   CLINDAMYCIN            300MG CAP      30 05/04/10 OKEKE, THEOPHILUS CC 04/30/10  RP  2  1       5.00   CASH
   632040698N1 TAKE 2 CAPSULES (600MG) THREE TIMES A DAY FOR 14 DAYS

020844N   OXYCOD APAP          10/325 TAB     150 05/05/10 OKEKE, THEOPHILUS CC 05/05/10 RW  0  0     114.00   CASH
   00951071270 TAKE 1 TABLET EVERY 4 HOURS AS NEEDED FOR PAIN (GENERIC FOR PERCOCET)

020846C   ALPRAZOLAM            2MG TAB       60 05/05/10 OKEKE, THEOPHILUS CC 05/05/10 RW  0  0      19.95   CASH
   59762372201 TAKE 1 TABLET TWICE A DAY (GENERIC FOR XANAX)

0144818   GLIPIZIDE            10MG TAB       30 05/10/10 OKEKE, THEOPHILUS CC 04/10/10  RP  2  1       7.95   CASH
   00378111001 TAKE 1 TABLET DAILY

0149342   METFORMIN          1000MG TAB       60 05/27/10 OKEKE, THEOPHILUS CC 04/10/10  TC  2  2      12.95   CASH
   65862001001 TAKE 1 TABLET TWICE A DAY (GENERIC FOR GLUCOPHAGE)

024253C   ALPRAZOLAM            2MG TAB       60 06/07/10 OKEKE, THEOPHILUS CC 06/07/10 RW  0  0      19.95   CASH
   59762372201 TAKE 1 TABLET TWICE A DAY (GENERIC FOR XANAX)

024254N   OXYCOD APAP          10/325 TAB     150 06/07/10 OKEKE, THEOPHILUS CC 06/07/10 RW  0  0     114.00   CASH
   00510712/0 TAKE 1 TABLET EVERY 4 HOURS (GENERIC FOR PERCOCET)

024255    GLIPIZIDE            10MG TAB       30 06/07/10 OKEKE, THEOPHILUS CC 06/07/10 RW  3  1       7.95   CASH
   00378111001 TAKE 1 TABLET DAILY

027195N   OXYCOD APAP          10/325 TAB     150 07/02/10 OKEKE, THEOPHILUS CC 07/02/10 RP  0  0      14.20   CASH
   00510712/0 TAKE 1 TABLET EVERY 4 HOURS (GENERIC FOR PERCOCET)

027196C   ALPRAZOLAM            2MG TAB       60 07/02/10 OKEKE, THEOPHILUS CC 07/02/10 RW  0  0      19.95   CASH
   59762372201 TAKE 1 TABLET TWICE A DAY (GENERIC FOR XANAX)

027255R   GLIPIZIDE            10MG TAB       30 07/12/10 OKEKE, THEOPHILUS CC 07/02/10 RW  2  1       7.95   CASH
   00378111001 TAKE 1 TABLET DAILY

028416    METFORMIN          1000MG TAB       60 07/14/10 OKEKE, THEOPHILUS CC 06/07/10 RW  2  1      12.85   CASH
   65862001001 TAKE 1 TABLET TWICE A DAY (GENERIC FOR GLUCOPHAGE)

028412N   OXYCOD APAP          10/325 TAB     150 07/26/10 OKEKE, THEOPHILUS CC 07/26/10 RP  0  0     114.00   CASH
   00510712/0 TAKE 1 TABLET EVERY 4 HOURS (GENERIC FOR PERCOCET)

028611C   ALPRAZOLAM            2MG TAB       60 07/26/10 OKEKE, THEOPHILUS CC 07/26/10 RW  0  0      19.95   CASH
   59762372201 TAKE 1 TABLET TWICE A DAY (GENERIC FOR XANAX)

                                          Totals this patient Num/Rx/UsRetail/Copays:   13     485.45    0.00
```

KING KULLEN PHARMACY
41 ?? HIGHWAY
GREENLAWN, NY  11740
(??) ????

Summary Information          Rx Retail    Copay   ??g
=====================================================

Total for LIZKOWITZ, RON          $42.35    0.00    14

Total For All Patients            $42.35    0.00    14

EXHIBIT "E"

September 24, 2010,

To The Honorable Judge Gershon:

I am writing this letter on behalf of my son Jon Itzkowitz. Jon has made his share of mistakes and as a mother I had hoped and prayed that he would have made better choices with his life. When Jon was growing up he had the potential and intelligence to be a success. After High School, Jon was a student at The University of Bridgeport for 1 ½ years. During that time, my mother passed away and I was diagnosed with Cancer. I believe these events contributed to his unfortunate choices. I also believe that my own addiction to drugs and alcohol have contributed to his poor choices. My father was also an alcoholic.

In June 1988 I entered a 12 step program and have recently celebrated 22 years of sobriety. My life has changed in so many ways. Before I entered a 12 step program I was not a very good mother, wife, daughter or friend. I was not an honest, trustworthy or employable human being. Today, I work for Stony Brook Foundation and have been employed here since 2002, I am a loving and caring mother and grandmother. When my Mom passed I was sober 10 years at that time and was able to be there as a daughter. I am an honest and loyal friend, my ex-husband and I have a wonderful relationship as friends and we truly care about each other and our family. I believe that this to can be true for my son.

I truly believe at this time that Jon has a new perspective on life and knows what a mess he has made. Jon said to me "Mom, I'm sorry for what I have done and hope one day I can be the son you have always wanted, a son that you can be proud of", which brought tears to my eyes. Jon is family oriented, and shows great love for his family. Jon is very close to his niece, nephew and sister who he spends quite a bit of time with. The family is together for all holidays, birthdays and special occasions.

I am asking to please have leniency with my son. He is not a terrible person and I do believe with all my heart he has learned his lesson. Jon is currently depressed about going away and not being able to see his family and I beg of you to place him close to home. He knows that he has to face whatever his sentence will be. Again, I plead with you as Jon's mother to imagine yourself in my position.

Respectfully,

Denise Itzkowitz

September 27, 2010

To the Honorable Judge Gershon:

Let me begin by saying, my son is loved by the whole family.   I wish I could turn back the clock 3 1/2 - 4 years ago and was able to see what was going on with my son, but I can't.  I was heartbroken to learn about his drug dealings and drug abuse.  I am pleading with Your Honor to show Jon as much leniency as possible with his sentencing.  Mr. Nelson has informed us of the guidelines regarding this matter, but I ask that you spare him from any lengthy prison term.

I can say my son has learned his lesson and this I am sure of by seeing him every week for the one hour visitation and talking with him on the phone at least 5 times a week. Jon has said "what I did was wrong and I wish I had not been such an ass."  He has shown humility and is taking responsibility for his crime.

My love for my son is immeasurable.   Jon is and always has been a great son, super brother and fantastic uncle to his niece and nephew (Anthony and Jada).  He was brought up with family values, he was always the smartest is his class; always happy and went on to college after graduating High School.

 Jon's mother was diagnosed with Breast Cancer in 2002 and again in 2007 and his grandmother passed away in 2002. That is when Jon started to change.  He dropped out of college, got a job and was working.  He took a turn for the worst but till this day I had no idea of his drug use and his drug dealings. Jon did not live at home and had his own apartment which was 5 minutes down the road from me.

He was helpful to the government with other cases and then messed up with them by being dishonest about his drug addiction.  He did supply the government with useful information that helped put two drug dealers away.  I am not condoning that Jon has committed a serious crime, but him giving useful information should be taken into consideration to.

I can only hope you could see this as I do; that my son is remorseful and sorry for the choices he made with his life.  We are all hoping and praying that Jon can come home and led a productive, rewarding life.

Respectfully,

David Itzkowitz

September 27, 2010

To the Honorable Judge Gershon:

I am writing you this letter on behalf of my brother Jon Itzkowitz.

I want you to know my brother as I know him.  Jon and I come from a very close knit family and our parents have been separated since he was 2 years old.  Jon and I were raised by both our parents; they have remained very good friends, till today.  They taught us to be good honest people.  Jon has made very bad choices in his life.  I believe he now knows that he was wrong in what he did.  I really believe that my brother will do the right thing when he comes home and will always have his family to come home to we will always be there for him.

Jon is also a very good uncle to my children and loves his niece and nephew so much and they love him.  Jon has always taught them to do the right thing.  Both my kids look up to him, especially my son Anthony who is 13 y/o, my son is also aware of what is going on and is learning a very big lesson.  Anthony is having a hard time because he really misses his Uncle who he has spent a lot of time with; they play video games, watch movies, go out for lunch, and just hang out.  Jada, who is 5 y/o doesn't understand what's going on but wants her Uncle Jon to come home, she really misses him; Jon always paid so much attention to her by telling her she so smart and reading to her.  He spent quality time with both his niece and nephew.

I also miss my little brother; he has always been there for me in good times and bad.  As brother and sister we have a typical relationship, we have our fights but we are family and we have always been there for each other.

I do understand that Jon has to pay for his poor choices.   Your Honor, I hope you find it in your heart to give him the least possible sentencing and allow him to come home to his family sooner than later to a family that loves him and misses him.

Respectfully,

Kim Itzkowitz

JUNE M. HARRIS

52 Clinton Avenue

Huntington, N.Y.  11743

September 3, 2010

To the Honorable Judge Gershon

Re:  Jon Itzkowitz

Dear Judge Gershon,

I am writing this letter on behalf of Jon Itzkowitz, who is currently awaiting sentencing.  I have known Jon since he was a very young child.  My first introduction to Jon was at a Cub Scout event in the gymnasium of his elementary school.  Jon has gone through most of his school years with my son, who is the same age.  Jon was also a neighbor of ours for many years.

It breaks my heart that Jon has found himself in his current situation.  I have fond memories of Jon borrowing novels from me during his junior high school years.  I was always impressed with his love of reading, and his ability to read books far advanced for his age.  I can attest to the fact that Jon comes from a very close knit, loving family.  Although his parents were divorced when he was a young child, I was amazed at their ability to co-parent Jon and his sister in an amicable, cordial, and respectful manner.  I have seen many other families in similar situations not fare as well.

As a parent myself, I know that our children do not always make the most sound choices for themselves.  Sometimes they stray from the path that we as parents, wish them to take.  If I could wave a magic wand, I would make all children take the wisdom and experience that their parents try to imbue upon them, to avoid all the horrible pitfalls and temptations in life.  Unfortunately, neither I nor any other parent has that power.

I just want you to know a little bit more about Jon, before you impose a sentence on him.  Obviously you have all the legal information at your disposal regarding Jon, but I'd like you to know about the side of Jon that you may not be aware of.  As long as I've known Jon, he has always been respectful towards me.  I had a handicapped son, who unfortunately passed away over 4 years ago.  Due to his handicapping condition, it wasn't easy for my other son to bring friends home to our house, as his brother had some behavioral problems due to his mental retardation, etc.  Jon always made it a point to be kind towards my handicapped son.  He treated him with respect and

kindness, when other kids his age, would cruelly make fun of him.  That meant a lot to my family.

Jon has a big heart, as I have seen him display it on numerous occasions.  He has a wonderful relationship with his young niece and nephew.  I would hate to see Jon's future be totally destroyed, if the sentence placed upon him was unduly punitive.  Having had several candid discussions with Jon after his legal problems, I'm convinced that Jon is extremely remorseful for making the poor choices that landed him in his current situation.  I know for a fact, that he has resolved to make a major change in his life for the better.  He knows he used horrendous judgment in the things he got involved in, and wishes he could take his actions back.  Not solely because he is in legal trouble, but because he had an Epiphany.  He now knows and understands that the path he was traveling down was definitely the wrong one.  He has a strong desire to straighten out his life in a positive way.  He wants to commit to living an honest, more integrity filled life.  He wants to make amends and perhaps have the opportunity to give back to his community one day.

I implore you, Judge Gershon, to show Jon compassion and leniency when sentencing him.  Please give him the opportunity to redeem himself, improve himself, and lead a decent moral life.  I believe that by incarcerating Jon for a lengthy period of time would vanquish any hope of that.  Jon is basically a good person, who got involved in stupid things.  He knows better now, and simply wants the opportunity to make amends and to illustrate to everyone by word and deed, that he truly means what he says.

Thank you, Your Honor, for taking the time to read my letter on Jon's behalf.


Respectfully,

*June M. Harris*

June M. Harris

Dear Judge Gershon

      My name is Christopher  Connolly, I have been employed with the NYPD as a police officer since Jan 2005. During my employment with the police department I have worked in Brooklyn North Housing until April of this year, when I began working in the Queens Detective Bearu.  I am writing this letter on behalf of Jon Itzkowitz. While I am aware of the seriousness of Jon's arrest in March of 2007, I do believe that Jon  Itzkowitz has  changed his life style  since  the time in question.  It is my understanding that Jon had a problem with  substance abuse.  I have known Jon since we were teenagers. It is my belief that Jon has changed his life dramatically since his arrest in 2007. I hope he is giving the opportunity to live a productive life, with his family which he is very close to.  Thank you for taking the time to read this letter.  I hope to continue to see Jon and his family in the future.

                          Sincerely,
                          p.o Connolly, Chris

EXHIBIT "F"

# Huntington Youth Bureau
## Drug and Alcohol Project
### 423 Park Avenue • Huntington, NY 11743
### Phone (631) 271-3591 • Facsimile (631) 271-5497

Report Submitted to: Judge Gershon and Alan Nelson, Attorny at Law
From: Meredith Cooper, LCSW
Re: John Itzkowitz

May 14, 2010

To Ms. Gershon and Mr. Nelson:

This letter is in regards to John Itzkowitz. He was admitted to our facility on 8/10/09 and has fulfilled all of his requirements in order to complete. John has submitted negative toxicology screens since his admission, and has provided scripts for his necessary medications.

Since John started treatment, he was very open to talking about his past drug addiction and legal issues. Over the past year, John has shown substantial remorse for his actions and has provided feedback to his peers about avoiding legal stressors. He has been a great asset to this facility. During groups and individual sessions, John has discussed his addiction and where he took him and truly opened up in order to achieve sobriety.

I would highly recommend that John continue in treatment in order to maintain his hard earned sobriety and to hopefully avoid any further legal issues. Even though he has reached his treatment goals, John has stated that he would prefer to continue with treatment.

If you need further information, please contact me at (631) 271-3591. Thank you.

Sincerely,

Meredith Cooper, LCSW
*Clinical Social Worker*



YMCA The Place

October 2nd, 2008

Alan M. Nelson, Attorney
1000 Marcus Avenue
Suite 125
Lake Success, New York
11042

Dear Mr. Nelson:

I am writing to you on behalf of our mutual client Jon Itzkowitz D.O.B. 5/28/1981. I understand Mr. Itzkowitz has an upcoming court date and that an updated progress report would be helpful. It is my pleasure to share with you the positive changes I have seen in Jon over the past several months along with his numerous accomplishments.

As you know, Jon was admitted to YMCA The Place on August 30th 2007 and remains in good standing since that time. Jon has been required to attend treatment twice a week and participate in all groups and exercises. To date Jon has attended 16 education groups, 36 recovery groups and 22 individual sessions. Jon received an education about the disease of addiction, family disease concept, coping skills, communication, relapse prevention and daily living skills. I have witnessed numerous and significant changes in Jon which are necessary to remain in the recovery process. Jon has made a tremendous effort to demonstrate his knowledge and understanding of all of these concepts evidenced by his behavior and the choices he makes today as a recovering young man.

Jon is gainfully employed and has a good sober support system through self help meetings, all of which are voluntary. Jon is also very close with his family and he has their full support in all his efforts as he continues to restructure his life. Jon has exhibited a genuine and sincere commitment to the continuous process of recovery as well as the related lifestyle.

If you need any further assistance, please do not hesitate to contact the agency at the above number. YMCA is a NYS certified agency under the NYS Office of Alcoholism and Substance Abuse Services.

Sincerely,

Peggy Ward CASAC